IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| 315 UNION STREET HOLDINGS, LLC, )<br>UNION STREET PLAZA OPERATIONS, LLC )<br>MARK LINEBERRY, and KEITH WORSHAM, )<br>)<br>                  Plaintiffs, )<br>)<br>v. )<br>)<br>BRANCH BANKING AND TRUST COMPANY, )<br>PEACHTREE HOSPITALITY MANAGEMENT, )<br>LLC, PEACHTREE HOTEL GROUP, LLC, )<br>ROB MALE, CHRIS SWEITZER, and )<br>GREG FRIEDMAN, )<br>)<br>                  Defendants. ) | No. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Come now the Plaintiffs, 315 Union Street Holdings, LLC, Union Street Plaza Operations, LLC, Mark Lineberry, individually, and Keith Worsham, individually, by and through their undersigned attorney and hereby bring this action against Branch Banking and Trust Company (hereafter, "BBT"), Peachtree Hospital Management, LLC (hereafter, "Peachtree Management"), Rob Male, a loan officer with BBT, Chris Sweitzer, an executive with BBT, and Greg Friedman, an executive with Peachtree.

**Jurisdiction and Venue**

1. This is an action at law brought pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Jurisdiction is conferred upon this Court by 18 U.S.C. § 1964; 18 U.S.C. § 1503; 18 U.S.C. § 1512; 18 U.S.C. § 1513; and 18 U.S.C. § 1951. Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

1

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e)(2) in that (a) a substantial part of the events or omissions giving rise to this action occurred in this district, and (b) the property which is the subject of this action is located in this district. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(c) in that Defendant BBT is a corporation that has an office and does business in this district and is therefore subject to personal jurisdiction in this district.

**Parties**

3. Plaintiff 315 Union Street Holdings, LLC (hereafter, "315 Holdings") is a Tennessee limited liability company with its principal place of business at 315 Union Street, Nashville, Tennessee. This company is the owner and developer of the real estate located 315 Union Street, Nashville, Tennessee which is presently operated as a hotel under the name of Hotel Indigo Nashville-Downtown (hereafter, "Hotel Indigo Project").

4. Plaintiff Union Street Plaza Operations LLC (hereafter, "315 Operations") is a Tennessee limited liability company with its principal place of business at 315 Union Street, Nashville, Tennessee. This company leases the real property at 315 Union Street, Nashville, Tennessee from 315 Holdings, and holds licenses to operate the hotel, bar, and restaurant located at 315 Union Street.

5. Plaintiff Mark Lineberry is an individual who is a resident of the State of Florida and is a member of 315 Holdings and 315 Operations.

6. Plaintiff Keith Worsham is an individual who is a resident of the State of Georgia and is a member of 315 Holdings and 315 Operations.

7. BBT is a North Carolina banking corporation with its principal place of business in Winston-Salem, North Carolina. It also has an office in and does business in Nashville, Davidson County, Tennessee. BBT received $3.134 billion in November, 2008 from the U.S. Treasury in funds available through the Troubled Asset Relief Program (TARP).

8. Peachtree Hotel Group, LLC (hereafter, Peachtree Group) is a company based in Atlanta which is in the business of managing, acquiring, and owning hotels. Peachtree Group has several subsidiaries or related entities, including but not limited to (a) Peachtree Hospitality Management (which manages hotels owned by others, hereafter "Peachtree Management"), and (b) Peachtree REIT, Inc. (which acquires, develops, and manages hotel and other real estate properties for investors, hereafter Peachtree REIT) whose President is Gregory Jacobs, formerly a loan officer at BBT.

9. Peachtree Hospitality Management, which is a subsidiary of Peachtree Hotel Group, holds itself out to be a hotel management company. Its principal office is in Atlanta, Georgia.

10. Rob Male is a Vice President with the Commercial Real Estate Division of BBT, and was the primary contact and loan officer for Plaintiffs during their entire relationship with BBT.

11. Chris Switzer is Senior Vice President of BBT in charge of commercial lending with BBT, in its Atlanta office.

12. Greg Friedman is presently Chief Executive Officer of Peachtree Hotel Group, LLC. Formerly, he headed up Specialty Finance Group (hereafter, "SFG"), a division of Silverton Bank (formerly known as Bankers Bank) before it collapsed in May, 2009 and was taken over by the FDIC.

**Underlying Facts About Plaintiffs' Negotiations**

13. In 2007 and the first quarter of 2008, Lineberry was seeking financing on behalf of 315 Holdings to acquire and develop a property located on Union Street across from the Metropolitan Nashville Courthouse (formerly known as the American Trust Building and a building adjacent thereto). Lineberry negotiated with a series of interested lenders, including Greg Friedman at Bankers Bank aka SFG, Empire Financial Services, and Rob Male at BBT.

   a. In early May, 2007, Plaintiffs first requested financing from Friedman and SFG for numerous projects, including Hotel Indigo.

3

b. On May 31, 2007, Plaintiffs received a commitment letter from Friedman and SFG for Hotel Indigo in the amount of $16,500,000 and received an FF&E commitment letter on June 4, 2007 in the amount of an additional $4.5 million for the furniture for Hotel Indigo.

c. On June 12, 2007, Plaintiffs provided SFG a secure access to download confidential files in reference to the refinance of the Hotel Indigo Project. See Exhibit L. This link provided access to tax returns, financial statements, development plan details, details of Plaintiffs' franchise arrangements, and proprietary market research related to Hotel Indigo.

d. This information was furnished to Friedman while he was Senior Vice President of Specialty Finance Group (SFG), a subsidiary of Silverton Bank. At the time, Friedman was the Senior Vice President of Business Development for Specialty Finance Group (SFG), a subsidiary of Silverton Bank. SFG was a direct lender providing first mortgage and FF&E financing for hotel projects. Mr. Friedman originated more than 1.6 billion of first mortgage and FFE transactions while at SFG, making him one of the most active financing sources in the hotel industry.

e. Following disclosure of this confidential information to Friedman, Friedman (in an act eerily foreshadowing the later conduct of BBT in its dealings with Plaintiffs) without cause reneged on SFG's commitment letter by lowering the amount of money he was willing to lend for the Hotel Indigo project. There was certainly nothing in the confidential disclosure materials which warranted such an action. Consequently, Plaintiffs ceased dealing with Friedman and SFG in or about September, 2007.

f. On Friday, May 1, 2009, Silverton Bank N.A., including its subsidiary SFG, was closed by the Office of the Comptroller of the Currency and the FDIC was named receiver. At the time of its closing, Silverton Bank had approximately $4.1 billion in assets and $3.3 billion in deposits.

g. Greg Friedman then started as President of Peachtree Hotel Group in July, 2009.

4

14. In late September, 2007 or early October, 2007 (after ceasing communications with SFG shortly before), Plaintiffs then started discussions with Rob Male at BBT relative to financing for the Hotel Indigo Project. The initial disclosure of confidential information to BBT was when Plaintiff Lineberry sent the market appraisal for Hotel Indigo to BBT on October 31, 2007. Negotiations between BBT and Plaintiffs continued on into the first quarter of 2008.

15. On March 21, 2008, BBT conveyed to Lineberry a Commitment Letter (Exhibit A), which set out the following essential terms:

    a. A loan for the above-referenced property had been approved for $20 million (¶ 5);

    b. The loan term was thirty-six (36) months (¶ 8);

    c. A $2 million CD was required to be deposited at BBT, but was to be released "upon the Borrower obtaining the proper Certificates of Occupancy for the two buildings" (¶ 13).

    d. The interest rate was a floating rate keyed to the LIBOR rate plus 275 basis points (2.75% per annum) (¶ 9).

16. The original deadline for the acceptance of this commitment was March 31, 2008, but this deadline was extended. Proof of BBT's agreement to the extension is in the fact that the $100,000 loan fee required in ¶ 14 was paid by check by Plaintiffs and accepted by BBT on June 23, 2008. See Exhibit B. The commitment letter was eventually agreed to by Plaintiffs 315 Holdings and 315 Operations on June 23, 2008 (see Exhibit A, p. 13).

17. During the first quarter of 2008, when Plaintiffs had entered into what they thought were the final round of negotiations with BBT, the market for hotel loans started to deteriorate and it became increasingly difficult to find other lending sources for projects such as the Hotel Indigo as 2008 progressed. For this reason, Plaintiffs signed the Commitment Letter on June 23, 2008, expecting the loan to close on or before August 15, 2008.

18. Based upon the mutual agreement reflected by BBT's Commitment Letter at Exhibit A, Plaintiffs discontinued their search for alternate financing from other lenders, including Empire. All parties proceeded to prepare for closing. An appraisal of the property was approved by BBT. In fact, the appraisal came back higher than anticipated (see Exhibit C).

**1. Underlying Facts Regarding Extortion Act 1**

19. The original deadline for closing was June 30, 2008, but was extended by mutual agreement to August 15, 2008. On July 14, 2008 BBT's attorney sent an email to Plaintiff Lineberry confirming this extension. See Exhibit D. During the first week of August, BBT's attorney sent closing documents to Plaintiff Lineberry for him to examine that bore the date of August 15, 2008 for execution at closing. However, during the week of the closing date, Defendant Rob Male "disappeared" and could not be reached to schedule the closing of the loan. The loan commitment expired due to avoidance by Rob Male and the refusal of Defendant Rob Male to return phone calls or make himself available to arrange for the closing, all of which was in violation and breach of the Commitment Letter, as amended. Missing the closing date of August 15, 2008 was entirely caused, and caused intentionally, by BBT and Defendants Male and Swietzer.

20. After the Commitment Letter was signed on June 23, 2008, Plaintiffs discovered that a very close relationship existed between Defendant Sweitzer and Dewberry Hotel Company, a division of a large commercial developer in Atlanta with aspirations at the time of becoming a hotel magnate. Dewberry had been negotiating the purchase of the Hotel Indigo property with Plaintiffs, but when Plaintiffs discovered the relationship between Dewberry and Sweitzer, Plaintiffs cut off all discussions with Dewberry. But Dewberry's interest in the Hotel Indigo property was not cut off, and upon information and belief, Plaintiffs assert that BBT's intent from August, 2008 was to be a stalking horse

6

for Dewberry to facilitate the forced acquisition of the Hotel Indigo property from Plaintiffs on behalf of Dewberry.

21. By August 1, 2008, it was virtually impossible to obtain any other financing source for a project such as Hotel Indigo. Hotel Indigo, however, became an even more attractive target for BBT and Dewberry because of the extremely favorable appraisal report dated August 1, 2008 appearing at Exhibit C. From August 1 forward, BBT determined to engage in a series of extortionate acts designed to force the failure of Plaintiffs in this project by whatever means necessary for the purpose of enriching BBT and its associates, including Dewberry.

22. It is for this reason that:

    a. BBT's loan officer, Defendant Male, disappeared for approximately one week before the loan closing scheduled for August 15, 2008, as described above and refused to close the loan pursuant to the Commitment Letter, as extended.

    b. BBT's loan officer, Defendant Male, notified Plaintiffs on the late evening of August 15, 2008 that the loan commitment was no longer valid.

    c. BBT tightened the vise even further on August 27, 2008 by issuing a new commitment letter that included lowering the principal amount of the loan by $1.3 million, converting the $2 million CD to collateral for the loan, and raising the interest rate on the loan by .25%. BBT knew that Plaintiffs were already heavily invested in the Hotel Indigo Project and had no possibility of alternative financing and that these new terms would increase the likelihood of the failure of Plaintiffs and force a foreclosure thereby ousting the Plaintiffs and capturing a windfall.

    d. Extorting these concessions to which BBT was not entitled pursuant to the terms of its original Commitment Letter by forcing Plaintiffs to agree to these terms on August 29, 2008.

7

Case 3:10-cv-01109 Document 1 Filed 11/22/10 Page 7 of 19 PageID #: 7

23. Finally at 6:00 PM ET on August 15, 2008, after all banks were closed, Defendant Rob Male called Plaintiff Keith Worsham and advised that the loan commitment had expired. He also advised that BBT would nevertheless move forward and present a new commitment letter shortly thereafter. Defendant Male offered no explanation for why he had made himself unavailable for the closing on the loan on the original commitment letter.

24. On August 27, 2008 BBT issued a Revised Commitment Letter (see Exhibit E) which contained at least three material changes to the original commitment letter:

    a. The total loan commitment was lowered from $20 million to $18.7 million;

    b. The $2 million CD was to be kept by BBT as collateral for the loan, instead of being returned to Plaintiffs upon obtaining the proper Certificates of Occupancy for the two buildings;

    c. The interest rate was raised to the LIBOR rate plus 300 basis points from 275 basis points.

25. In a phone conversation between Plaintiffs Lineberry and Worsham and Rob Male on August 27, 2008, relative to the revised commitment, Rob Male stated "I strongly advise you take this deal because this is the last hotel deal that BBT will be making and you won't find hotel financing anywhere else." No consideration was offered or made by BBT for the change in the terms of the BBT commitment, and BBT made no offer to return the $100,000 commitment fee for the original commitment letter.

26. On August 29, 2008 the loan was closed consistent with the terms of the Revised Commitment Letter at Exhibit E.

27. From September, 2008 until July, 2009, construction proceeded on the project and BBT funded the monthly construction draws.

8

## 2. Underlying Facts Regarding Extortion Act 2

28. There is a history of an incestuous relationship between the principals of BBT and the principals of Peachtree. The President of the Peachtree subsidiary which acquires hotels from others, Peachtree REIT, Inc., is Gregory Jacobs, formerly a loan officer at BBT.

29. In July, 2009, Defendant Friedman formally joined Peachtree. Friedman had previously been with Silverton Bank, which had provided financing for a portion of the Allen Plaza in downtown Atlanta, GA, which included the W Hotel. BBT also furnished financing for a portion of the Allen Plaza. Both lenders moved to foreclose on their respective Allen Plaza loans and worked closely side-by-side during the process. In May, 2009, Silverton Bank collapsed and its assets were taken over by the FDIC. By this time, Friedman and Sweitzer had established a working relationship.

30. Upon joining Peachtree, Friedman utilized his close relationship with Sweitzer at BBT to target off-market hotel deals such as Plaintiffs' Hotel Indigo Project and to quench Friedman's thirst to build a dominant hotel company. Friedman has made no secret of hoping to acquire two to three hotels per year and to exploit the information he learned as a banker during which time he financed hotel projects with SFG for nearly a decade. Friedman has also bragged widely about his strong relationships with lenders, local banks, and special servicers which helps Peachtree move fast with off-market deals. Peachtree's last three deals closed in under 37 days from contract execution.

31. This perfectly set the stage, therefore, for the next series of extortionate acts by BBT, this time as a stalking horse for Sweitzer's old friend and associate, Friedman. BBT ceased the funding of construction draws for Hotel Indigo in July, 2009 and the need for cash to continue construction became critical. Construction crews were walking off the job, their companies were threatening liens, operating costs (to pay employees that had already been hired, utilities, taxes, and interest) continued to be incurred, and construction delays amounting to 90 days threatened to destroy the entire project by

9

delaying the opening of the hotel. This pressure thus led to a meeting between Plaintiffs and Defendants Male and Sweitzer at BBT's Atlanta office on August 4, 2009. During this meeting, Sweitzer indicated that BBT was anxious to remove Plaintiffs Lineberry and Worsham from the Hotel Indigo Project, but BBT was debating whether to force Plaintiffs Lineberry and Worsham to abandon the project or to "hold their nose" and allow said Plaintiffs to complete the project. Lineberry contended that 90% of the project was completed and to stop construction at that point would add delays, jeopardize the work that had been completed, and result in construction liens that would add litigation costs. BBT made the business decision at the conclusion of that meeting to continue funding but to tighten the vise even further on Plaintiffs and indicated that a new loan restructuring would be necessary and details would be divulged in a letter to follow.

32. On August 7, 2009 BBT sent notice to Plaintiffs that the loan was in default because the project was over budget and behind schedule. See Exhibit F. Plaintiffs deny that an event of default had occurred at the time of the issuance of the default letter (August 7, 2009) and that the letter was used as an extortion device to change the terms of the loan agreed to on August 29, 2008.

33. On September 29, 2009, the terms of the August 29, 2008 loan were indeed changed by BBT (see Exhibit G, First Modification to Secured Promissory Note), in which BBT agreed to reinstate the project loan if and only if certain terms were modified, the most significant of which were as follows:

    a. Interest rate was increased from LIBOR plus 300 basis points (approximately 3 1/4 % per annum at the time) to PRIME plus two, which has resulted in Plaintiffs paying an equivalent interest rate of 6% per annum;

    b. Shortened loan term to end September 30, 2010 instead of September 1, 2011. Section 3 of the Modification Agreement in Exhibit G contained an option to extend the maturity date by one year from September 30, 2010 upon the satisfaction of certain conditions.

34. With a "financial gun" at their heads, Plaintiffs agreed to these extortionate demands by BBT, which increased even further the likelihood of ultimate failure of Plaintiffs' Hotel Indigo Project:

35. The hotel opened as a full-service operation under the name Hotel Indigo on March 19, 2010. This opening would have occurred in December, 2009 but for the actions of Defendants BBT, Sweitzer, and Male as described in the previous paragraphs. As a result of this delay, the hotel was unable to take advantage of holiday bookings, revenues were impaired, and the hotel incurred additional expenses (including but not limited to salaried personnel, utilities, interest).

### 3. Underlying Facts Regarding Extortion Act 3

36. After the completion of the Hotel Indigo Project in March, 2010, hotel performance ramped up quickly (occupancy increased at a fast clip and revenue proceeds increased steadily) and payments on the note were made timely by Plaintiffs. Therefore, on August 16, 2010 Plaintiffs 315 Holdings and 315 Operations delivered a Notice of Intent to BBT to extend the loan pursuant to Section 3 of the Modified Agreement (Exhibit G) as reflected by the letter at Exhibit H.

37. In accordance with customary practice since the initiation of payments on the loan, on September 10, 2010 Plaintiffs 315 Holdings and 315 Operations notified Defendant Rob Male via email that sufficient funds had been deposited into the 315 Operations checking account at BBT to cover the September 1, 2010 payment obligation on the loan. Plaintiffs later discovered that this money had not been drafted by BBT from the checking account and applied to the debt obligation under the Modification Agreement.

38. On September 28, 2010, Rob Male advised Plaintiffs Lineberry and Worsham that the extension option would not be honored by BBT despite the fact that Plaintiffs had complied with all necessary prerequisites under the Modified Agreement at Exhibit G and all obligations due on the September 1, 2010 payment. Upon learning this, Plaintiffs Lineberry and Worsham caused the funds

11

originally intended for the September, 2010 payment to be withdrawn from the 315 Operations Account at BBT.

39. However, BBT delivered another extortionate blow on October 8, 2010 by declaring the note was in default and required Plaintiffs to advise when and how they intended to pay off the loan in its entirety within thirty (30) days, again ignoring the option obligation contained in the Modified Loan Agreement (see Exhibit M).

40. During October 8-13, 2010, Defendant Rob Male caused BBT to sweep through all other BBT accounts maintained by Plaintiffs and collected $53,327.70, including $851.32 from an account that included the name of Plaintiff Lineberry's wife.

**Underlying Facts Relative to Extortion Act 4**

41. In a continuation of the incestuous relationship between BBT and Friedman / Peachtree, on November 2, 2010, BBT filed a "Verified Complaint for Appointment of Receiver Pending Foreclosure" in Davidson County Chancery Court, attached hereto as Exhibit J.

42. In the "Verified Complaint for Appointment of Receiver Pending Foreclosure" filed by BBT on November 2, 2010, BBT prays for, among other forms of relief, the appointment of Defendant Peachtree Management as the management company for the Hotel Indigo (see Exhibit J, ¶ 41).

43. This action in state court was removed by Plaintiffs to federal court, i.e., U.S. District Court for the Middle District of Tennessee on Tuesday, November 16, 2010. On Friday, November 19, 2010, upon the insistence of BBT, the federal Court conducted an immediate hearing for the purpose of appointing a receiver. At the conclusion of the hearing, the Court ordered the appointment of a receiver, GGG, Inc. pursuant to its request in ¶ 40 of Exhibit J. Upon knowledge, information, and belief, BBT will shortly accomplish its ultimate goal of securing the appointment of Peachtree as the manager of

Hotel Indigo pursuant to its request in Exhibit J ¶ 41, which will be the precursor to the acquisition of Hotel Indigo by Peachtree for its Peachtree REIT.

44. Peachtree Group has acquired the reputation of a "fast-track vulture" in the hotel management and acquisition industry. Its president, Greg Friedman, has been quoted as saying:

> Our speed of execution on these properties averaged 20 days from start to finish. Our understanding of banking regulation and creative transaction structures allow us to navigate through these challenging markets. Both our investment and management teams are poised to take advantage of opportunities as they are presented.

See Exhibit K.

45. Peachtree Group stands to profit from the arrangement proposed in Exhibit J, as well as its use of inside knowledge gained through access to confidential information about Plaintiffs' financial situation previously furnished by Plaintiffs on June 12, 2007 (Exhibit L), which will in turn give Peachtree's family of companies, including Peachtree REIT, Inc., an inside track to the acquisition of Hotel Indigo.

## Count One — RICO With the Predicate Act of Extortion

46. Plaintiffs hereby reallege and reaffirm the allegations of paragraphs 1 through 45 inclusive of this Complaint as if fully set forth herein.

47. Defendants are "persons" as that term is used in 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

48. Chris Sweitzer is employed by and manages and directs the commercial real estate lending activities of BBT. Defendant BBT together with Defendants Sweitzer and Male comprise "Enterprise 1", as that term "enterprise" is defined in 18 USC § 1961, has engaged in a pattern of racketeering activity at all relevant times herein. This Enterprise 1 was engaged in, and its activities affected, interstate and

13

foreign commerce. Such enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

49. Greg Friedman is President of Peachtree Group and therefore directs the hotel management activities of Peachtree Management and directs the hotel acquisition activities of Peachtree Group, including its subsidiary Peachtree REIT.

50. Defendant Peachtree Group, together with Defendants Peachtree Management and Friedman and BBT and Sweitzer and Male comprise "Enterprise 2" as the term "enterprise" is defined in 18 USC § 1961, and has engaged in a pattern of racketeering activity at all relevant times herein. This Enterprise 2 was engaged in, and its activities affected, interstate and foreign commerce. Such enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

51. All Defendants have conspired, confederated, and agreed with each other to violate 18 USC § 1962(c), in violation of 18 USC § 1962(d). This Enterprise was engaged in, and its activities affected, interstate and foreign commerce. Such enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

    a. Sweitzer and Male conspired, confederated, and agreed with each other to conduct and participate in the conduct of the affairs of BBT (Enterprise 1) through a pattern of racketeering activity, and they agreed that two or more racketeering acts, including the racketeering acts referred to in Paragraphs 19 through 27 and Paragraphs 28 through 35 — which constitute violations of the Tennessee criminal extortion statute and the federal Hobbs Act — would be committed on behalf of the conspiracy.

    b. Sweitzer's and Male's violation of § 1962(d) was related to, and committed within the course of, their employment with BBT; was committed in furtherance of the business of BBT; and was authorized and acquiesced in by BBT. In addition, BBT benefited from the violation of § 1962(d) by Sweitzer and Male. Thus BBT is liable for violating § 1962(d) under *respondeat superior*.

c. Friedman and Peachtree Group and Peachtree Management together with BBT, Sweitzer, and Male conspired, confederated, and agreed with each other to conduct and participate in the conduct of the affairs of Enterprise 2 through a pattern of racketeering activity, and they agreed with Enterprise 1 and the principals therein that two or more racketeering acts, including the racketeering acts referred to in Paragraphs 36 through 40 and Paragraphs 41 through 45 — which constitute violations of the Tennessee criminal extortion statute and the federal Hobbs Act — would be committed on behalf of the conspiracy.

d. Friedman's violation of § 1962(d) was related to, and committed within the course of, his employment with Peachtree Group; was committed in furtherance of the business of Peachtree Group; and was authorized and acquiesced in by Peachtree Group. In addition, Peachtree Group benefited from the violation of § 1962(d) by Friedman. Thus Peachtree Group is liable for violating § 1962(d) under *respondeat superior*.

52. In the alternative, the Defendants have formed a small union or group of individuals associated in fact, although it never became a legal entity.

(a) This "association in fact" is characterized by the following:

(1) It is an ongoing informal organization,

(2) Which has been operating in a consensual rather than an hierarchical manner since July, 2009 and continues to operate at the present time,

(3) Whose unity and commonality of purpose has been the use of financial extortion as illustrated above to force hotel owners, including Plaintiffs, to divest themselves of their respective property holdings at depressed prices so that some or all of the same properties can be acquired by the Peachtree at fire sale prices.

15

Case 3:10-cv-01109   Document 1   Filed 11/22/10   Page 15 of 19 PageID #: 15

(b) This "association in fact" became an "enterprise", designated herein as Enterprise 3, engaged in racketeering.

53. Chris Sweitzer, Rob Male, and Greg Friedman have engaged in and used Enterprise 3 (which also includes BBT and Peachtree) to engage in the following racketeering activity in regard to the acts alleged in this Count:

a. Extortion and / or attempted extortion chargeable under Tennessee state law at TCA § 39-14-112, which is punishable by imprisonment for not less than two and not more than twelve years pursuant to TCA § 40-35-111. Defendants individually and as the Enterprise have used or attempted to use coercion upon Plaintiffs with the intent to obtain the Hotel Indigo property for the benefit of themselves individually and their respective companies. The coercion used or attempted included the following acts proscribed as coercion by TCA § 39-11-106(a)(3): (1) harming the credit or business repute of Plaintiffs, (2) coercing and attempting to coerce concessions from plaintiffs at the stages enumerated above, in violation of contract terms already in place, in order to effect the failure of Plaintiffs in the Hotel Indigo project, (3) attempting to deprive Plaintiffs of their right to manage the Hotel Indigo Property, and (4) attempting to strip Plaintiffs of their ownership of the Hotel Indigo property.

b. Interference or attempted interference with interstate commerce by extortion in violation of 18 U.S.C. §1951 (commonly known as the Hobbs Act). Defendants individually and working together as the Enterprise either did or attempted to obstruct, delay, or affect commerce (i.e., the construction and operation of Hotel Indigo as well as the purchase, management, lease, and sale of property by Plaintiffs from and to persons in and out of Tennessee) by extortion in that they attempted to obtain the property of another (plaintiffs) induced by the wrongful use of actual or threatened force, or fear, or under color of official right.

54. Defendants individually and as Enterprise 3 intentionally committed the acts complained of in this Count and purposely and knowingly and maliciously engaged in such behavior with full knowledge that, if successful, the plaintiffs would be stripped of their assets and properties. Defendants individually and as Enterprise 3 either knew or should have known that their actions would generate immense fear in the mind of any reasonable man. They knew or should have known that their actions as specified herein constituted the wrongful use of fear and constituted a pattern of racketeering activity. Further, Defendants individually and as Enterprise 2 knew or should have known that plaintiffs would suffer the damages specified below.

55. The aforementioned conduct has resulted in the following injury to the plaintiffs:

(a) $500,000 in additional interest paid due to the increase in interest by BBT on September 29, 2009;

(b) $500,000 in increased construction costs and lost revenue occasioned by BBT's cessation of construction draws in July, 2009.

(c) As a result of these actions, Plaintiffs were and still are damaged competitively in their ability to continue to operate Hotel Indigo and are in imminent danger of losing ownership of the Hotel Indigo.

(d) As a result of these actions, BBT declared defaults where none existed and have created a scenario in which Plaintiffs were asked to pay off a loan amounting to $17,928,285.42 plus interest (see Exhibit M), when payments were made timely and in full through the due date for the September 1, 2010 payment.

(e) As a result of these actions, BBT wrongly confiscated $2 million of Plaintiff Lineberry's CDs;

(f) As a result of these actions, legal fees were incurred and paid by or on behalf of plaintiffs in the case.

56. By virtue of these aforementioned acts in this Count, Defendants individually and as Enterprise 1 or Enterprise 2 or Enterprise 3 have violated 18 U.S.C. §1962(c).

57. By virtue of these aforementioned acts in this Count One, Defendants individually and as Enterprise 1 or Enterprise 2 or Enterprise 3 have violated 18 U.S.C. §1962(d).

**Count Two — Violation of Privacy Act**

58. Plaintiffs hereby reallege and reaffirm the allegations of paragraphs 1 through 57 inclusive of this Complaint as if fully set forth herein.

59. The confidential information that was divulged by Plaintiffs on June 12, 2007 to SFG was subject to the privacy provisions of Gramm-Leach-Bliley, codified at 15 USC § 6802 (hereafter, GLB Act).

60. Using this confidential information obtained previously from Plaintiffs (including tax returns, financial statements, development plan details, details of Plaintiffs' franchise arrangements, and proprietary market research), Friedman is now assisting BBT in Federal Court in the Middle District of Tennessee to secure Peachtree as the manager of Hotel Indigo and to force Plaintiffs Lineberry and Worsham out of the management and ultimately out of the ownership of Hotel Indigo.

61. This conduct constitutes an unfair trade practice and a violation of copyright law.

62. This conduct is also a violation of the FTC final rule regarding the <u>Privacy of Consumer Financial Information</u> as required by § 504(a) of the GLB Act. The rule was published in the <u>Federal Register</u> in Volume 65, No. 101 on Wednesday, May 24, 2000 / Rules and Regulations Federal Trade Commission at 16 CFR Part 313.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray:

1. That proper process issue and be served on Defendants and that they respond in the time provided for by law;

2. That this Court issue a Restraining Order and Temporary Injunction enjoining the Receiver GGG, Inc. from appointing Greg Friedman, Peachtree Group or any of its subsidiaries, or any other management company recommended or requested by BBT;

3. That a jury of twelve persons to try the issues in this cause;

4. That judgment be had in favor of Plaintiffs and against defendants as named and indicated in the caption of this cause, and that compensatory damages be awarded to Plaintiffs in an appropriate sum not to exceed Four Million Dollars ($4,000,000);

5. That treble damages be awarded to Plaintiffs to be paid by Defendants in an appropriate sum not to exceed Twelve Million Dollars ($12,000,000.00);

6. That costs and attorney's fees be awarded to Plaintiffs;

7. And for such other, further, and general relief to which Plaintiffs may be entitled.

Respectfully submitted,

s/ Elliott Ozment

Elliott Ozment, Attorney at Law
Law Offices of Elliott Ozment
1214 Murfreesboro Pike
Nashville, TN 37212
(615) 321-8888 (O)
(615) 321-5230 (F)
Email: elliott@ozmentlaw.com